Daniel M. Gilleon (SBN 195200)
James C. Mitchell (SBN 87151)
Samuel A. Clemens (SBN 285919)
The Gilleon Law Firm
1320 Columbia Street, Suite 200
San Diego, CA 92101
Tel: 619.702.8623/Fax: 619.702.6337
dmg@mglawyers.com
jcm@mglawyers.com
sac@mglawyers.com

Attorneys for Plaintiff Melanie Wilson

# UNITED STATES DISTRICT COURT,

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELANIE WILSON,<br><br>Plaintiff,<br>vs.<br><br>CHRISTOPHER R. HAYS;<br>CITY OF SAN DIEGO,<br><br>Defendants.<br>_____ | **CASE NO.** '16CV1161 BAS DHB<br><br>**COMPLAINT FOR:**<br><br>1. **Violation Of Civil Rights 42 U.S.C. § 1983; and**<br>2. *Monell* **Failure To Train, Screen, Supervise Sworn Police Officers** |

Plaintiff Melanie Wilson alleges:

## GENERAL ALLEGATIONS

1.     Plaintiff Melanie Wilson resides in San Diego County, California.

2.     At all material times, defendant Christopher R. Hays ("Hays") was employed as a sworn police officer by defendant City of San Diego in its police department ("SDPD"), and in doing the acts alleged in this complaint was acting within the course and scope of his employment as a police officer with the City.  On information and belief,  beginning on or before June 17, 2015, Hays departed from California, began residing in Russellville, Arkansas, and has continued to reside there ever since.

*Wilson v. Hays*, USDC Case No. _____
Complaint

1

3.     Defendant City of San Diego is a California municipal corporation and a government agency.

4.     Each of the defendants was the agent or employee of the other defendants and in doing the acts alleged in this complaint was acting within the course of scope of such agency and employment.

5.     This Court has jurisdiction because this lawsuit presents a federal question, whether defendants violated 42 U.S.C. § 1983.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events, occurrences and omissions giving rise to this lawsuit occurred in this district.

7.     Part of the events that led to Wilson's claims began, at the latest, in 1994 when one Anthony Arevalos graduated from the San Diego Police Academy and immediately became employed as a sworn police officer with SDPD and the City. The City, the SDPD and SDPD's supervisory officials, failed to properly test, screen, examine, evaluate or train Arevalos before hiring him as a police officer. As a result, the City, SDPD and SDPD supervisory officials failed to properly identify Arevalos for what he was — a dangerous sexual predator. Had the SDPD, the City and SDPD supervisory officials properly tested, screened, examined, evaluated and trained Arevalos, he never would have been hired as a police officer.

8.     Upon information and belief, SDPD's supervisory officials and the City had knowledge of the following as of September 2009:

a.     In the 1999, when Arevalos was working general patrol in the SDPD's South Bay Division, he took into custody a nude and mentally deranged young woman as a Health & Welfare Code § 5150 detainee and then taunted and encouraged the woman to sexually penetrate herself vaginally with his department-issued baton/night stick while he watched and took Polaroid photographs of her doing this;

b.     A complaint by a woman that, during a traffic stop of her by Arevalos in April or May 2001, that Arevalos, during an unlawful search of the

woman, groped the woman's breast and sexually assaulted her;

c.      Around July 2007, Arevalos pulled over a 16-year old female driver during a routine traffic stop and forced her to bend over outside of her vehicle to show him her current registration tabs on the license plate — all for the purpose of Arevalos "checking out" or ogling the young woman's butt;

d.      That Arevalos, after being assigned to the SDPD traffic division and its special driving under the influence, or "DUI" enforcement unit, regularly and unnecessarily targeted for investigation and arrest for DUI primarily young women under 35 years of age to the extent that other police officers derisively referred to Arevalos as the "Las Colinas Transport Unit;"

e.      Arevalos routinely had large amounts of unaccounted for or "missing" time during his shifts, in particular, during stops of female motorists, that were never adequately explained in his written reports or shift diaries;

f.      Arevalos, using the camera on his cellular phone, surreptitiously took photographs of young women in the Gaslamp Quarter in downtown San Diego and forwarded the photographs to other police officers, including to his supervisor, Sergeant Kevin Friedman;

g.      Among the photographs Arevalos took and shared with fellow police officers and supervisors were photographs of him being orally copulated and engaging in sexual intercourse in uniform all in the back of a SDPD patrol car, some of which he kept in an album at the police station;

h.      Arevalos bragged when showing these photographs to other police officers and his supervisors that he was the uniformed officer in the photographs;

i.      In September 2009, rather than arresting a woman Arevalos had detained for driving while under the influence or DUI, he solicited a bribe of a sexual favor from her in return for releasing her, a felony under Penal Code § 68, and then sexually assaulted her anyway; and

j.      Other information about citizens' or other police officers'

*Wilson v. Hays*, USDC Case No. _____

Complaint

3

complaints about Arevalos' misconduct, conduct unbecoming a police officer or conduct that violated SDPD procedures or standard police procedures for handling traffic stops or performing physical searches of suspects, in particular, women.

9.     The 1999 incident with Arevalos and the mentally deranged woman described in paragraph 8.a. was interrupted by another police officer who reported the incident.  Arevalos physically threatened the officer warning him to never again interrupt him.  Nevertheless, the police officer, who is now retired, reported the incident to his and Arevalos' supervisors, Sergeant Danny Hollister and Sergeant (now Lieutenant, and head of the powerful SDPD Criminal Intelligence Unit) Rudy Tai.  Tai passed the information on to his supervisor, Lieutenant Jorge Guevara.  Neither Hollister, Tai nor Guevara did anything to report the incident involving Arevalos and the deranged young woman up the SDPD chain of command, or to other SDPD supervisory officials charged with investigating officer misconduct.  Rather, along with Arevalos, they destroyed the Polaroid photographs taken by Arevalos and other evidence of the incident.  Tai also gave Arevalos a verbal reprimand, something Tai knew would not appear on Arevalos' personnel record and could mislead police officials that Arevalos had never been involved in suspected misconduct toward citizens.  In addition, Guevara, Tai and Hollister, with the support of other police officers and other SDPD supervisory officials, carried out a campaign of abuse, intimidation and harassment against the police officer who reported the incident to punish him for making the complaint against a fellow officer, Arevalos.  This included initiating improper conduct with that police officer's minor daughter.

10.     This 1999 cover up of Arevalos' criminal misconduct and cover up of later misconduct by him and other officers was done as part of a long-standing unwritten SDPD policy that encouraged a two-tiered system of justice — one a system of unwritten privileges and immunities that applied to SDPD police officers and other members of the "law enforcement community" and another system of codified laws and regulations that applied to the ordinary citizens.  This SDPD "unwritten policy"

included not ticketing SDPD police officers stopped for Vehicle Code violations, including DUI, and also "fixing tickets" for SDPD police officers, as well as other law enforcement officers and officials. This "unwritten policy" also manifested itself with SDPD police officers and SDPD supervisory officials discouraging fellow police officers from reporting instances of suspected police officer misconduct to their supervisors, or SDPD Internal Affairs ("IA") the division of the department charged with investigating police officer misconduct. The policy further included SDPD police officers and supervisory officials covering up reports of officer misconduct. This policy has continued through the present time.

11.   The April or May 2001 incident described in paragraph 8.b. above was reported by the victim to Arevalos' supervisors at SDPD, as well as to other SDPD supervisory officials. The then SDPD police chief, David Bejarano, learned of the report and the incident. He met with the victim twice and she described to him the details of the traffic stop and sexual assault by Arevalos. Chief Bejarano told the victim Arevalos had already been properly disciplined and would never again be allowed to do what he did to her or any other citizen. This was a complete misrepresentation as Arevalos was never punished or disciplined for that 2001 incident.

12.   The minor involved in the July 2007 traffic stop described in paragraph 8.c., her father and a family friend who was a SDPD sergeant reported the incident to Arevalos' then supervisors, Sergeant Matt Verduzco and Lieutenant Victoria Binkerd. The documentation on the report was destroyed, the matter was not investigated and the family friend (the SDPD sergeant) was rebuked by fellow officers and SDPD supervisory officials for "siding with a civilian" against a fellow officer, Arevalos.

13.   The victim of the September 2009 incident described in paragraph 8.i. reported the incident to an SDPD detective who, because of the "unwritten policy" described in paragraph 10, failed to report the incident to his supervisors, or to other SDPD supervisory officials or IA.

14.   SDPD supervisory officials and the City also had knowledge of a February 2010 complaint by a woman who was arrested for DUI by Arevalos in January 2010.  She notified SDPD that Arevalos had either assaulted or sexually assaulted her in the back seat of his police car while he was transporting her to the Las Colinas Women's Facility.  SDPD supervisory officials and the City believed this was a crime committed by Arevalos and recommended prosecuting him for these crimes to the Office of the District Attorney, San Diego County.  However, SDPD supervisory officials, then Captain Mary Cornicelli and then Lieutenant Brian Ahearn, along with Sergeant Friedman, Arevalos' supervisor, and other police officers, impaired not only the SDPD investigation of the incident by the SDPD Sex Crimes Unit, but the effective exercise of prosecutorial discretion to prosecute Arevalos by falsely impugning the victim's credibility and otherwise attempting to unfairly influence members of the District Attorney's office to not prosecute Arevalos.  After the District Attorney declined to prosecute Arevalos, SDPD supervisory officials, in particular, then Assistant Chief Robert Kanaski, returned Arevalos to his previous duties with the traffic division without imposing any reasonable disciplinary actions upon him.

15.   During a portion of the time Arevalos was assaulting women, as alleged above and below, and also during the time Hays was assaulting women, as alleged below, another sworn police officer with the SDPD, Kevin Hychko, who was then assigned to the Central Division, was also sexually assaulting and battering women under color of authority and engaging in other sexual misconduct while on duty.  For example, while at Central between 2009 and 2012, Hychko would routinely groom victims of domestic violence and seduce these vulnerable women for his own sexual gratification.  Hychko would make traffic stops of attractive female drivers, without probable cause or reasonable suspicion, and without airing (notifying dispatch of) the stops so he could intentionally prevent any record of the stops from being created, all for the purpose of grooming and seducing the female drivers.  During this time frame,

SDPD command, including but not limited to Assistant Chief Mark Jones, had actual knowledge of some of Hychko's misconduct but, as they did with Arevalos, chose not to take any corrective action.

16.    In Fall of 2012, Hychko was on patrol near a nightclub with professional dancers inside the club. One of the dancers caught his eye, and he ordered a bouncer at the nightclub to bring the dancer to his patrol car, where he made sexual advances to her. A supervisor learned of the incident, and reported it to Chief Jones, who took no action except to transfer Hychko to the Northeastern Division, where Hychko continued the same type of misconduct.

17.    While in Northeastern in 2013, Hychko continued pulling over women without airing the calls and without probable cause, just as he had done at Central. One young woman he pulled over turned out to be a young recruit in the police academy. Hychko continued his seduction with the young recruit over the next several months. In late 2013, Hychko met an underage (17 years old) woman during his patrol duties, and thereafter maintained an inappropriate relationship with her. Hychko's longstanding misconduct was well known throughout the ranks at SDPD, including the command level officials, who did nothing to correct the action, at least not until the federal government stepped in and chastised the SDPD and its command on the public stage.

18.    Chief William Lansdowne resigned under pressure in 2014 by the new mayor of the City, Mayor Kevin Faulconer. Faulconer then appointed his friend, Shelley Zimmerman, to become the Chief of Police, even though she was part of the very command that had allowed the likes of Arevalos and Hychko (and Hays too) to openly engage in misconduct that violated SDPD policy and procedures and commit criminal acts with impunity. It was only after the City was forced to endure the public humiliation of the federal government's probe, that Chief Zimmerman took action against Hychko. She launched a confidential IA investigation out of the media's and the public's eyes.This resulted in nothing more than Hychko's termination, while

avoiding another criminal prosecution of a police officer that would have further embarrassed and even implicated SDPD's command officials, who, like Chief Zimmerman, were leading the SDPD during the misconduct.

19. From 2003 to the present, the SDPD, its supervisory officials and the City instituted a procedure for investigating citizens' complaints of police officer misconduct that was inadequate and designed to not impartially investigate such complaints. Such policy or policies relegated citizens' complaints to the SDPD of officer misconduct to second-class status where such complaints were either not investigated at all, or received less than an impartial investigation by SDPD and its supervisory officials.

20. The City, the SDPD and its supervisory officials had policies that have continued through to the present of:

a. Failing and refusing to establish or enforce administrative procedures and training to ensure safety of detainees or arrestees;

b. Failing and refusing to adequately discipline police officers, like Arevalos and others, for acts of abuse and misconduct, conduct that violated SDPD department procedures or conduct unbecoming a police officer;

c. Failing and refusing to impartially investigate citizen's complaints of alleged abuse or misconduct by police officers;

d. Reprimanded, threatened, intimidated and demoted police officers who reported acts of misconduct or abuse by other officers;

e. Covering up acts of police officer misconduct or sanctioned a code of silence by police officers commonly referred to as the "Blue Wall," which resulted in complaints of police officer misconduct not being investigated or not being adequately and impartially investigated;

f. Failing and refusing to adequately supervise the actions of police officers under their control and guidance;

g. Intentionally mischaracterizing and improperly identifying

complaints against Arevalos and other police officers of suspected police misconduct against citizens as low-level "Public Service Inquiries" in an attempt to dissuade victims of suspected misconduct, other police officers and witnesses from telling their stories of suspected officer misconduct and, also, to avoid having to report such complaints to the Citizen's Review Board On Police Misconduct, IA or the City's Mayor's office, or others, and through this, to prevent complete, objective and factual investigations of such complaints and avoid possible bad publicity in the media about the SDPD and its police officers, in particular, the chief of police, and the SDPD upper chain of command;

i.    Allowing the "unwritten policy" described in paragraph 10 to exist; and

j.    Failing to have in place a specific written department policy that mandated all police officers who either witnessed, or who received verbal reports of on-the-job police officer misconduct to report such alleged misconduct to SDPD supervisory officials, including, but not limited to, IA.

21.    In addition and upon information and belief, SDPD, its supervisory officials and the City knowingly sanctioned or allowed a pattern of conduct by male police officers, including traffic division officers, that consisted of patrolling the Gaslamp Quarter Downtown San Diego, and certain beach community areas, that consisted of a party-type atmosphere where male police officers, including supervisors, such as, for example, Sergeant Friedman, were attempting to get dates with or pick up women while on duty.

22.    SDPD, its supervisory officials and the City from at least 1999 to the present:

a.    Knowingly, with gross negligence and with deliberate indifference of the constitutional rights of citizens, maintained and permitted an official policy and custom of permitting the occurrence of the types of wrongs alleged in this complaint;

b.    Maintained, fostered, condoned or else failed to correct wrongful

*Wilson v. Hays*, USDC Case No. _____

Complaint

9

conduct and, through this, created an official policy practice or custom of permitting the occurrence of the types of wrongs alleged in this complaint;

c.     Maintained, fostered or condoned policies and customs, including but not limited to, deliberate indifferent training of its police officers about what constituted unreasonable searches or seizures of citizens;

d.     Maintained, fostered or condoned policies and customs that included the express and/or tacit encouragement to its police officers to ignore unlawful conduct and/or to ratify police misconduct by officers failing to intercede when unlawful conduct was underway and/or by making material omissions in police reports to prevent detection of unlawful conduct; and

e.     Maintained, fostered, condoned or failed to conduct adequate investigations of police misconduct to prevent future misconduct from occurring.

23.     In or around 2003, the SDPD chief, then Landsdowne, other SDPD supervisory officials and the City disbanded the SDPD's 20-year old anti-corruption unit, the "Professional Standards Unit," or PSU. The PSU had, as its official charge, the responsibility of actively and aggressively investigating, uncovering and prosecuting police misconduct, including misconduct that was subject to complaints by members of the public allegedly victimized by police officers charged with protecting and serving citizens of San Diego. The elimination of the PSU, this specialized unit, was a signal and affirmation to the SDPD, its police officers and its supervisory officials that those police officers who chose to exploit their positions of power, authority and trust by victimizing members of the very community they had sworn to protect would not be investigated, prosecuted, pursued or punished for their actions. The message was that such suspected victimization and police misconduct would be tolerated, protected, covered up and/or ignored. In addition, Chief Landsdowne instituted a process, manner and method by which complaints against police officers were handled that significantly altered and, in fact, prevented members of the public from lodging complaints against police officers directly with the IA.

*Wilson v. Hays*, USDC Case No. _____
Complaint

Chief Landsdowne instituted a policy that denied the public access to IA and required citizens to lodge complaints of suspected police officer misconduct with low-level desk officers at local stations who were not trained to handle such citizen complaints. This policy change was motivated by the SDPD, the City and the SDPD supervisory officials' desire to deter, avoid and prevent full reporting and investigation of officer-related misconduct through intimidation, harassment, embarrassment, frustration and obstruction of the public means of seeking redress for such police officer related misconduct, in reality, the "unwritten policy" described in paragraph 10.

24. The SDPD police officer, Hays, who committed the wrongful acts against Wilson and others, as alleged in this complaint, attended the police academy in 2009 and 2010 and was hired as a sworn police officer with the SDPD and the City in late 2009 or early 2010. He was then aged 26 and was the son-in-law of then SDPD Captain and now Assistant Chief, Mark Jones, a veteran officer of some 30 years, who now heads SDPD's Special Operations Unit

25. The SDPD training sergeant at the academy when Hays attended it was one Sandra Rapalee. Hays' field training officer, Mark Lopez, recommended to Rapalee and other SDPD supervisory officials at the academy that Hays' performance at the academy was well-below average, he was unfit to be a SDPD police officer and he should be "washed out" and not hired as a police officer. On information and belief, Jones, who in 2009 and 2010 was not assigned to the academy or involved with police officer candidates' training or evaluations, violated SDPD policy and wrongfully interfered with and influenced the potential decision by Rapalee, or other training officers at the academy to wash his son-in-law, Hays, out. On information and belief, Jones interceded with Rapalee asking her to return a favor he did for her and not wash Hays out of the academy. On information and belief, Rapalee did this and rejected the recommendation of Hays' training officer, Lopez, to wash Hays out of the academy. As a result, Hays, who was unfit to be a police officer and should not

*Wilson v. Hays*, USDC Case No. _____

Complaint

have been hired as a police officer was hired as an officer by SDPD.

26.    The City, SDPD and SDPD supervisory officials, failed to properly test, screen, examine, evaluate or train Hays before hiring him as a police officer.  As a result, they failed to properly identify Hays as a person who was unfit to be a police officer.  Had the City, SDPD and SDPD supervisory officials properly tested, screened, examined, evaluated and trained Hays, he would never have been hired as a police officer.

27.    In March 2011, after a report by one Jane Doe to the SDPD and the City that Arevalos had sexually assaulted her during a DUI traffic stop on March 9, 2011, Arevalos was fired from his job as a police officer and charged by the District Attorney with crimes committed against the Jane Doe and various other victims, ***People of the State of California v. Anthony Arevalos***, San Diego Superior Court Case No. SCD233024.  On November 17, 2011, Arevalos was convicted of the following crimes:

a.    Jane Doe, sexual battery, Penal Code § 243.4(a), soliciting a bribe, Penal Code § 68, assault and battery, Penal Code § 149 and misdemeanor false imprisonment, Penal Code §§ 236, 237(a);

b.    Jeannie E., soliciting a bribe, Penal Code § 68, misdemeanor false imprisonment, Penal Code §§ 236, 237(a);

c.    Melissa Wilde, soliciting a bribe, Penal Code § 68, assault and battery, Penal Code § 149 and misdemeanor false imprisonment, Penal Code §§ 236, 237(a);

d.    Melissa Marin., soliciting a bribe, Penal Code § 68, misdemeanor false imprisonment, Penal Code §§ 236, 237(a); and

e.    Melissa R., soliciting a bribe, Penal Code § 68.

28.    The SDPD's and District Attorney's investigation of Arevalos instigated by the Jane Doe incident revealed numerous other incidents of criminal misconduct by Arevalos consisting of false imprisonment, false arrest, assault and battery, sexual

assault and battery and soliciting bribes from young women he allegedly pulled over for Vehicle Code/traffic violations between 2009 and March 2011.  The additional victims included Mary Bracewell, Dani Fisher, Talia Tortora, Lacy White, Marjan Montazemi and Emma M., as well as at least five other victims.

29.   In 2011, then SDPD Chief, Landsdowne, promised the public that the City, SDPD and SDPD supervisory officials would review and revise all policies for identifying, reporting, documenting and investigating police officer misconduct, either misconduct reported by a citizen, or witnessed by other police officers, as well as review and revise the procedures for disciplining police officers proved to have engaged in misconduct.  The City, SDPD and SDPD supervisory officials failed to do this and, instead, allowed the situation and circumstances described in paragraphs 8 through 28 to continued unchanged and unabated.

30.   In 2011, then Chief Landsdowne also promised the public that the City, the SDPD and SDPD supervisory officials would do a top to bottom investigation and review and institute the necessary changes in departmental policies so that SDPD police officers, as well their supervisors, were properly trained and supervised to insure that incidents of suspected police misconduct were identified, reported, documented and investigated.  This promise of creating and implementing new SDPD policies, rules and procedures to create a "standard of excellence" were not done by the City, SDPD and SDPD supervisory officials. Again, the  circumstances described in paragraphs 8 through 28 were allowed to continue unchanged.

31.   Landsdowne also promised the public in 2011 that the City, SDPD and SDPD supervisory officials would institute a written department-wide policy and procedure that mandated all police officers who either witnessed or who received verbal reports by the public of suspected police officer misconduct to report the alleged misconduct to SDPD supervisory officials or to IA.  The City, SDPD and SDPD supervisory officials failed to institute such a policy until April 29, 2014 and to date have not enforced the policy or have only selectively enforced it.

32. In 2011, then Chief Landsdowne also promised the public that the City, SDPD and SDPD supervisory officials would investigate the earlier reports and incidents of Arevalos' misconduct, as alleged in paragraphs 8, 14 through17, 27 and 28, to determine if other police officers were involved in the misconduct, or if police officers and SDPD supervisory officials had handled the incidents and complaints properly. Despite this promise, the City, SDPD and SDPD supervisory officials never ordered or conducted any such investigation.

33. As a result of the facts alleged in paragraphs 8 through 32, misconduct and crimes against citizens by police officers, like Hays, as alleged below, were allowed to and did continue.

34. Hays, as it turned out, was more of a sexual predator, who abused his power and authority as a SDPD police officer to either illegally and forcibly solicit and/or to obtain sexual favors from women he dealt with during the course of performing his duties as a police officer, than Arevalos. The City, SDPD and its supervisory officials learned in January or February 2014 about the following suspected criminal misconduct by Hays while he was performing his duties as a police officer on these eight victims and possibly others:

a. Michelle Davis, false imprisonment, sexual assault and battery, indecent exposure, forcible oral copulation, soliciting a bribe, early October, 2012;

b. Nicole Johnson, false imprisonment, approximately August 9, 2012;

c. Claudia Ariza, sexual assault and battery, indecent exposure, false imprisonment, June 12, 2013;

d. Jakema R., false imprisonment, sexual assault and battery, October 30, 2013;

e. Melanie W. (now identified as Melanie Wilson, the plaintiff) false imprisonment, sexual assault and battery, December 23, 2013;

f. Amber P., false imprisonment, sexual assault and battery,

December 23, 2013;

      h.     Jane Doe 4, false imprisonment, December 24, 2013; and

      g.     Jane Doe 7, false imprisonment, sexual assault and battery, October 2013.

35.    On February 9, 2014, the SDPD arrested Hays charging him with felonies and misdemeanors involving his alleged crimes committed against Wilson, Jakema R., Amber P. and Jane Doe 4.  On February 18, 2014, the District Attorney filed a criminal complaint against Hays, *People v. Hays*, San Diego Superior Court Criminal Case No. SCD253998, charging Hays with felonies and misdemeanors for alleged crimes committed against Jakema R.,  Amber P., and Wilson.  Hays resigned as a police officer from SDPD and the City on February 19, 2014.  On August 22, 2014, Hays plead guilty to one count of false imprisonment and two misdemeanor counts of assault under color of authority; other charges against Hays were dismissed.

36.    Wilson fully cooperated with SDPD and District Attorney detectives and investigators, who discouraged her from pursuing legal action against Hays and the City, e.g., by suggesting that filing a claim would make her appear "greedy." Likewise, none of the detectives, lawyers, advocates, or other members of the prosecution team provided any information to Wilson that would have led a reasonable person to suspect the facts giving rise to the *Monell* allegations in this complaint.  As with most of Hays' victims, Wilson's living conditions at the time of the assault not only made her very vulnerable to Hays' exploitation, but also made it impossible for her to learn any facts giving rise to the *Monell* claim.  For example, she was homeless and financially destitute at the time, and had no meaningful access to any public records or media that would have provided her any such information.  As a result, Wilson did not know, nor would a reasonable person in her circumstances have known until April 2016, the City and the SDPD had engaged in the practices or committed the failures, as alleged in this complaint, that caused Hays to commit the misconduct and crimes, and/or that she was injured as a result of the City's and the

SDPD's policies and procedures or failures in policies and prodcedures, which form the basis for the *Monell* cause of action.

**FIRST CAUSE OF ACTION**
**(Violation Of Civil Rights, 42 U.S.C. § 1983**
**Against All Defendants)**

37.     Wilson re-alleges paragraphs 1 through 36.

38.     On December 23, 2013 at approximately 5:12 a.m. near 50th Street and El Cajon Boulevard in San Diego, Wilson was out collecting items for recycling. That morning she had forgotten her glasses at home, broken her flashlight, had a fight with her boyfriend, and was lost in an unfamiliar part of town. Though she had used methamphetamine earlier that day, she was aware of what was happening around her. At this time, she was contacted by Hays who was on duty, in full uniform and was driving a marked SDPD patrol car. Hays asked her what she was doing and Wilson replied she was collected items for recycling. She explained her then present circumstances of being lost, forgetting her glasses, and breaking her flashlight. Hays offered Wilson a courtesy ride home. Contrary to Wilson's previous interactions with the SDPD, Hays did not request any identification, but merely asked her name. Though this courtesy ride seemed unusual, being in a difficult situation, Wilson accepted the ride put, her recycling bags in the rear seat of the police car, and sat down next to the bags. After a few moments of waiting in the car, Hays drove Wilson to an address where she was staying.

39.     Wilson exited the vehicle and Hays immediately told her he needed to search her. He lacked any probable cause to search her. Wilson then walked up the driveway with her recycling bags while Hays followed her with a couple more of her bags. Not wanting to create a problem for herself or for the people in the home, she consented to the improper search of her body. Wilson reasonably believed that if she did not comply, it would make matters worse for her, so she had no other option. Wilson asked Hays for his name during their encounter, and he told her it was "Officer Hays." Hays conducted the search, not by "patting down" Wilson, rather, he touched

her in a continuous motion, touching her breasts and vagina, and lingering over every part of her body.  The search took approximately three minutes, which was longer than any search of her by the SDPD Wilson had ever previously encountered. The search violated SDPD  policy and procedure, was without probable cause, was not consented to by Wilson and was excessive and unreasonable.

40.     After the search concluded, Wilson expected and hoped Hays would leave the area; however, he stayed in the driveway for approximately an hour and a half.  Hays made comments about what a cool cop he was for spending time with Wilson, asked what color underwear she was wearing, made comments about her boyfriend, and boasted about his sexual actions in bed.  When speaking about Wilson's boyfriend, Hays asked her why she was with a Vietnamese man and what did Asian men have that white men did not.  When speaking about his sexual preferences, Hays stated that, in bed, he would pull a woman's hair and bite her neck, come up behind her, put his arm around her, and pull her down.  Finally, Wilson reached her breaking point and ended the conversation.  Shortly thereafter, Hays left the scene. Fearful no one would believe her, Wilson did not report the incident until she was contacted by SDPD detectives after the first of the year in 2014.

41.     Wilson has constitutional interests and rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and similar provisions of the California Constitution to be free from an unreasonable seizure or detention of her person, sexual harassment or violation of her person during such detention and arrest, as well as the right to not have her body violated by a law enforcement officer.  The acts of Hays and the City constituted a deprivation of or a violation of Wilson's constitutional rights under the U.S. and California Constitutions and in turn, were a violation of 42 U.S.C. § 1983.

42.     As a legal result of the wrongful acts by defendants, Wilson has suffered general damages of mental and emotional distress, humiliation, anxiety and physical pain and suffering

43.   Hay's acts further constituted malice, fraud and oppression as defined in California Civil Code § 3294, which entitles Wilson to recover punitive damages against him.

## SECOND CAUSE OF ACTION
### (*Monell* Claim, Violation Of Civil Rights, 42 U.S.C. § 1983 Against All Defendants)

44.   Wilson re-alleges paragraphs 1 through 41.

45.   The acts of Hays and the City constituted a deprivation of or a violation of Davis' constitutional rights under the Fourth and Fourteenth amendments to the U.S. Constitution and under Article 1, Section 1 of the California Constitution and Hays acted under the color of law when he committed the wrongful acts.

46.   Based upon the above allegations, the City's training, screening, testing, evaluation  supervision and examination policies were not adequate to ensure that its police officers were properly trained to handle the usual and recurring situations with which they must deal and were not adequate to ensure that unfit individuals, like Hays, Arevalos and Hychko were not hired and/or retained as sworn police officers. Based upon the above allegations, the City was and is deliberately indifferent to the obvious consequences of its failure to properly and adequately train, screen, supervise and evaluate its police officers and the deprivation of Wilson's rights by Hays was a direct legal result of the City's failure to properly train, screen, examine, supervise and evaluate its police officers.

47.   Wilson re-alleges paragraphs 42 and 43.

## JURY DEMAND

48.   Wilson requests a trial by jury.

/ / /

/ / /

/ / /

/ / /

/ / /

## REQUEST FOR RELIEF

THEREFORE, plaintiff Melanie Wilson requests a judgment against defendants Christopher R. Hays and the City of San Diego for:

      a.    General and special damages according to proof;

      b.    Attorneys' fees and expert fees under 42 U.S.C. § 1988;

      c.    Costs of suit;

      d.    Prejudgment interest according to proof;

      e.    Punitive damages against Hays; and

      f.    Any other proper relief.

Date: May 13, 2016           The Gilleon Law Firm

/ James C. Mitchell /

James C. Mitchell, Attorneys for
Plaintiff Melanie Wilson

*Wilson v. Hays*, USDC Case No. _____
Complaint